COMMISSIONER OF REVENUE *vs.* NEW ENGLAND POWER
COMPANY.

Suffolk. November 5, 1991. - December 16, 1991.

Present: LIACOS, C J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Administrative Law*, Substantial evidence. *Taxation*, Abatement,
Franchise tax. *Public Utilities*, Electric company, Rate structure, Con-
struction work in progress. *Words*, "Used."

The Appellate Tax Board correctly determined that a public utility corpo-
ration's property under construction, held and occupied, but not in ser-
vice or generating income during the taxable years in question, was
"used" by the utility within the meaning of G. L. c. 63, § 38 (*d*), where
the utility's engaging in construction activities was a necessary function
of its business and where the inclusion of the value of its construction
investment in the federally set rate base indirectly generated income for
the utility. [421-423]

The Appellate Tax Board correctly determined that the term "used" in
G. L. c. 63, § 38 (*d*), should not be defined with reference to a Multis-
tate Tax Commission regulation, where the Legislature had declined to
adopt the commission's definition despite a recommendation to do so.
[423-424]

This court declined to consider on appeal an issue not raised before the
Appellate Tax Board below. [425]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Eric A. Smith*, Assistant Attorney General, for Commis-
sioner of Revenue.

*John S. Brown* for the taxpayer.

NOLAN, J. The Commissioner of Revenue (commissioner)
appeals from a decision of the Appellate Tax Board (board)
granting an abatement of public utility franchise taxes as-
sessed against the taxpayer, New England Power Company

(NEP), for the years 1983 and 1984. The commissioner contends that the board erred in holding that the average costs of NEP's construction work in progress (CWIP) should be considered in determining the property factor fraction used to apportion NEP's taxable income for purposes of the Massachusetts public utility franchise tax. The commissioner argues that the CWIP property was not "used" by NEP during taxable years 1983 and 1984, and therefore it is categorically excluded from the property factor equation set forth in G. L. c. 63, § 38 (*d*) (1990 ed.). The commissioner argues alternatively that, at least, the property factor should be calculated without regard to the allowance for funds used during construction (AFUDC) component of the CWIP costs. We affirm the board's decisions.

NEP is a Massachusetts corporation engaged in the business of generating, purchasing, transmitting, and selling electrical energy in wholesale quantities. As a public utility, NEP is subject to the public utility corporation franchise tax imposed by G. L. c. 63, § 52A (1990 ed.).[1] NEP conducts business both within and without Massachusetts;[2] accordingly, its total taxable income is apportioned to Massachusetts for corporate tax purposes pursuant to a formula set forth in G. L. c. 63, § 38. NEP timely paid the franchise taxes assessed against it in 1983 and 1984.

---

[1] General Laws c. 63, § 52A (2), provides: "Every utility corporation doing business both within and without the commonwealth shall pay annually a tax upon its corporate franchise equal to six and one-half per cent of that portion of its net income during the taxable year as is allocable to the commonwealth."

[2] NEP and its affiliates employ approximately 5,000 people and service a population of about 1,200,000. Nine hundred thousand customers live in Massachusetts. In 1983 and 1984, NEP's principal facilities in Massachusetts were Brayton Point Station in Somerset and Salem Harbor Station in Salem. NEP also holds title to three nuclear power plants as a tenant in common with other public utilities. Two of these plants are located in New Hampshire and one is located in Connecticut. During 1983 and 1984, these plants stood at various stages of readiness for operation, but none generated any electricity. NEP also conducted business in Massachusetts during the stated years, primarily involving the conversion of the Salem Harbor Station from oil to coal-based energy production.

NEP is subject to rate regulation by the Federal Energy Regulatory Commission (FERC). FERC also imposes a tariff on public utilities and requires those companies to fulfil the power requirements of their customers and to give not less than seven years' notice of intention to cease furnishing power, subject to a hearing and approval by FERC of arrangements for an alternative supply. To ensure compliance with this regulation and anticipate the projected market demand for its services, NEP regularly engages in forecasting and planning the types of plants to build, from which to purchase power, or in which to invest. During 1983 and 1984, NEP was involved in the construction of two nuclear energy plants located outside Massachusetts and the conversion of Salem Harbor Station in Massachusetts from oil to coal-based energy production. See note 2, *supra.* NEP included the CWIP costs associated with these projects in its tax returns for 1983 and 1984.[3]

On August 25, 1987, the commissioner notified NEP of the intention of the Department of Revenue (department) to assess additional taxes against NEP for taxable years 1982, 1983, and 1984. The commissioner subsequently adjusted NEP's 1983 and 1984 tax assessments, deducting the value of NEP's CWIP account from the property factor of the fraction used to determine the portion of NEP's total income which was derived from business carried on within the Commonwealth. In revising NEP's taxable income in this regard, the commissioner purported to act pursuant to an "audit guideline," which expressly excluded property under construction from the property factor. Exclusion of the CWIP value from the property factor substantially increased NEP's Massachusetts taxable income.

NEP paid the adjusted tax assessments and timely filed applications for abatement. The commissioner denied NEP's

---

[3]The major components of the 1983 and 1984 CWIP accounts were: land, raw materials, equipment and machinery, workers' wages and salaries, employee benefits, and the costs of financing AFUDC. The CWIP account had an average balance of $591,000,000 in 1983 and $735,000,000 in 1984.

applications stating that "[i]t has been the consistent position of the Commissioner . . . that property in the construction in progress account is not used to produce income nor to create jobs prior to its being placed in use[,] . . . [therefore] [it] is not includible in the property factor of the income apportionment formula." NEP thereafter petitioned the board for review of the commissioner's decision. The board overturned the commissioner's ruling, concluding that NEP "used" its CWIP property within the meaning of G. L. c. 63, § 38 (d), in the sense that it engaged in the construction activities "to meet its [FERC] responsibilities as a public utility." The commissioner appealed pursuant to G. L. c. 58A, § 13 (1990 ed.). We agree with the board that NEP was entitled to an abatement of the additional taxes assessed for 1983 and 1984.

1. *The property factor.* As indicated above, NEP is obligated to pay a Massachusetts corporate franchise tax, which is based on a percentage of the portion of NEP's taxable income attributable to business conducted in Massachusetts. G. L. c. 63, § 52A (1990 ed.). In order to determine the percentage of the business apportionable to Massachusetts, the corporation's total income is multiplied by a fraction, "the numerator of which is the property factor plus the payroll factor plus the sales factor; and the denominator is three." G. L. c. 63, § 52A (3). The "property factor" is defined in G. L. c. 63, § 38 (d), as follows: "[A] fraction, the numerator of which is the average value of the corporation's real and tangible personal property *owned or rented and used* in this commonwealth during the taxable year and the denominator of which is the average value of all the corporation's real and tangible personal property owned or rented and used during the taxable year" (emphasis added). The statute does not define the term "used."

The commissioner contends that NEP did not "use" its CWIP property during the subject tax years, so it properly was excluded from the apportionment equation. The commissioner argues that the "use" requirement means that the property must actually be placed in service and, since the

CWIP property did not contribute to the generation of electricity during the subject tax years, it was not "used" as required by the statute and must be excluded from the property factor. NEP responds that the board properly found that NEP engaged in the construction work in order to meet the FERC requirement that it maintain a level of operating capacity beyond its current demand and thereby ensure its preparedness to meet future needs. In addition, NEP states that the board correctly observed that electric power cannot be stored and therefore "the only way [NEP] can maintain standby facilities or reserve sources of what it is required to furnish to its customers is to build and maintain facilities which generate it." On the basis of these findings, NEP asserts, the board logically determined that NEP "used" its CWIP property during 1983 and 1984 as required by § 38 (*d*), because it "held, occupied, and had some benefit of its construction work, in the sense that it was building general capacity that would enable it to supply future demand for power and thereby to remain in business." For these reasons, NEP argues that its investment in the construction projects properly was included in the property factor. The board's decision "will only be disturbed if it was not supported by 'substantial evidence,' or was tainted by an error of law." *Tenneco Inc.* v. *Commissioner of Revenue*, 401 Mass. 380, 383 (1987), and cases cited.

In *Commissioner of Revenue* v. *Exxon Corp.*, 407 Mass. 17, 22 (1990), we upheld the board's judgment that "unoperated acreage" was property "used" by the taxpayer within the meaning of § 38 (*d*) (and therefore includible in the property factor), despite the fact that the property did not directly generate income during the taxable year. We agreed with the board's conclusion that, since the taxpayer had to maintain the acreage for research and development purposes in order to remain a competitive force in its business, the value of the property should be included in the property factor which measures the value of the taxpayer's activities in this jurisdiction. We can discern no meaningful distinction between the *Exxon* case and the present case.

As the board found, NEP's maintenance and construction of energy plants is a necessary function of its business. Like the unoperated acreage in *Exxon*, the CWIP properties developed by NEP did not produce income as a result of producing energy in 1983 and 1984, but their existence nevertheless contributed to NEP's over-all revenue production. *Exxon, supra.* Pursuant to a rate-setting order issued by FERC in 1985, NEP included fifty per cent of its CWIP costs in the report of its rate base to FERC. The rate base may be defined as "the amount of the investment on which [a regulated utility] is entitled to an opportunity to earn a fair and reasonable return." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 450 (1971). In general, the rate base excludes items that are not currently "used and useful to the ratepayers." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 21 (1978). FERC considered the CWIP amounts in setting NEP's rates and thereby allowed the company to derive revenues based on its CWIP expenses. Whether the implicit determination by FERC that the CWIP property was "used and useful to the ratepayers" suggests that the CWIP property was "used . . . during the tax year" under § 38 (*d*) is an issue we need not address in deciding this matter. The inclusion of the CWIP account into the rate base is significant, however, because it indirectly generated income for NEP — the element of the business with which the apportionment statute is concerned. *Tenneco Inc., supra* at 389 (apportionment formula designed to figure a rough approximation of a corporation's income from activity conducted in Massachusetts with reference to the corporation's total income wherever derived). We hold that the board's determination that NEP's CWIP property was "used" for purposes of § 38 (*d*) is supported by its findings of fact and its findings of fact are supported by substantial evidence.

The commissioner further argues that the term "used" should be construed in accordance with the department internal audit guideline, which is premised on the interpretation of "used" adopted in the Uniform Division of Income for

Tax Purposes Act, 7A U.L.A. 331 (1985) (UDITPA) and regulations promulgated by the Multistate Tax Commission. Under these regulations regarding the property factor, "[p]roperty or equipment under construction during the tax period . . . shall be excluded from the factor until such property is actually used in the regular course of the trade or business of the taxpayer." 2 Multistate Corporate Income Tax Guide (CCH) par. 8258 (1990). The commissioner asserts that this definition is persuasive authority in construing the term "used" in G. L. c. 63, § 38 (d), since § 38 (d) contains almost verbatim the language employed in § 10 of the UDITPA to define the property factor. The board rejected the commissioner's argument along this line, stating that the Legislature did not adopt the UDITPA provision when amending the definition of the property factor in 1966, despite a recommendation to do so. See 1965 House Doc. No. 143. See also St. 1966, c. 698, § 58. For this reason, the board concluded that the term "used" should not be defined with reference to the Multistate Tax Commission regulation.[4] We agree with the board's reasoning on this issue and hold that this definition of "used" does not control this case.

---

[4] In so holding, the board noted that the commissioner's denial of NEP's applications for abatement relied on the limitation that NEP's CWIP had not been "used to produce income" — a standard more restrictive than the simple "used" language of § 38 (d), more limited than the "used in the regular course of the trade or business" language of the Multistate Tax Commission regulation, and, indeed, more circumscribed than the language of the commissioner's own audit guideline which states, "used in connection with the production of income or . . . available for or capable of being used in the production of income." The board concluded that this inconsistency in the definition and application of the "used" requirement signalled a less than "well-established policy" by the department regarding the inclusion of CWIP in the property factor and therefore held that the commissioner's audit guidelines were not entitled to the force and effect of a regulation duly adopted by the department. See *Massachusetts Elec. Co. v. Department of Pub. Utils.*, 383 Mass. 675, 680 (1981). The record supports the board's conclusion that the unpublished audit guidelines had not been properly adopted as policy by the department and therefore could not fairly be applied to NEP in this case. See *Polaroid Corp. v. Commissioner of Revenue*, 393 Mass. 490, 492 (1984). We express no opinion, however, as to whether the commissioner possesses the statutory authority to adopt such a regulation.

2. *The inclusion of AFUDC in the CWIP account.* The commissioner argues that, even assuming that CWIP property is "used" within the meaning of § 38 (*d*), and thus includible in the property factor, the AFUDC component of the CWIP account should be deducted from the property factor. It appears from the record we have before us that the commissioner raised the *topic* of AFUDC valuation at various points during the proceedings before the board and presented testimony on this issue. However, there is nothing in the record to support the commissioner's contention that the issue of the propriety of including AFUDC in the CWIP account was presented as a distinct question for the board's determination. Significantly, in its findings of fact and opinion, the board simply defined AFUDC and referenced the testimony received on the issue of the difference between capitalizing CWIP and AFUDC and recovering that cost after the plant is put in service, or expending CWIP and AFUDC for recovery out of fees collected during construction. In context, AFUDC seems to come under discussion by the board solely for the purpose of analyzing the issue whether CWIP is properly included in the property factor. Under G. L. c. 58A, § 13, we are precluded from "consider[ing] any issue of law which does not appear to have been raised in the proceedings before the board." The lack of a meaningful finding or conclusion by the board on the question of AFUDC inclusion in CWIP renders the record insufficient for this court to decide this issue of law on appeal. *Beardsley* v. *Assessors of Foxborough,* 369 Mass. 855, 856-857 n.3 (1976) ("whether the evidence warranted a particular finding or a particular ruling of law should be raised by a request filed with the board, and failure to file such a request . . . will justify an affirmation of the decision of the board because nothing will be properly before us for review").

The decision of the board is affirmed.

*So ordered.*