No. 67,954

In the Matter of the Appeal of MORTON THIOKOL, INC., from an Order of the Board of Tax Appeals.

(864 P.2d 1175)

Opinion filed December 10, 1993.

*Gerald J. Letourneau*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause and was on the brief for appellant.

*David Prager, III*, of the Kansas Department of Revenue, argued the cause, and *Mark A. Burghart*, general counsel, was with him on the briefs for appellee.

*William L. Goldman*, of Lee, Toomey & Kent, Chartered, of Washington, D.C., and *Anne G. Batter*, of the same firm, were on the brief for *amicus curiae* Committee on State Taxation.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Morton Thiokol, Inc., (Morton Thiokol) appeals from an order of the Board of Tax Appeals (BOTA). The Kansas Department of Revenue (Revenue) assessed additional corporate income tax of $82,607 plus interest of $49,732 against Morton Thiokol for fiscal years ending June 30, 1981, through June 30, 1983. The additional tax resulted principally from (1) use of the domestic combination method of apportioning income and expenses for the multijurisdictional corporation and (2) the treatment of foreign dividends as apportionable business income. The assessment was upheld by the Kansas Director of Taxation (Di-

rector), and BOTA affirmed the Director's order. The case was transferred from the Court of Appeals on this court's motion, pursuant to K.S.A. 20-3018(c).

Morton Thiokol is a Delaware corporation, and it stipulated that it is unitary with all its domestic and foreign subsidiary corporations. The Multistate Tax Commission Corporate Income Tax Audit Procedure Guideline Manual, February 1985, defines a unitary business as follows:

"A business is considered to be a unitary business, whether it conducts its operations through one corporation or through several corporations, if and to the extent that its various components 'contribute to or are dependent upon' each other. [Citation omitted.] An indicator of such interrelationships is a 'flow of value' between the components."

In considering a multistate corporation, this court defined a unitary business as follows:

"A multi-state business is a unitary business for income tax purposes when the operations conducted in one state benefit and are benefited by the operations conducted in another state or states. If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary." *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, Syl. ¶ 1, 304 P.2d 504 (1956).

Morton Thiokol has subsidiaries incorporated both in the United States (domestic) and elsewhere (foreign). Morton Thiokol's multiple corporate entities, both domestic and foreign, are parts of a single unitary enterprise. Thus, Morton Thiokol is a multijurisdictional and unitary corporation. Because it does business in Kansas, it is subject to Kansas corporate income tax.

Kansas treats the entire business of a unitary business together, and the various corporate parts of the unitary business file a combined tax return in the state. Kansas taxes an apportioned share of the entire business of a multijurisdictional unitary enterprise. That apportioned share in theory bears some relation to the value earned in the state. In other words, apportionment assigns to Kansas its share of the corporation's tax base. The formulary apportionment, of necessity, is abstract and somewhat arbitrary. There is no contention in this case, however, that some method of combined filing and apportionment should not be used. Revenue used the domestic combination method to calculate Mor-

ton Thiokol's Kansas tax liability, and the corporation advocates use of the worldwide combination method. Therein lies the root of the problem in this case.

In its order, BOTA quoted the following explanation of the two methods:

" 'Under [the domestic combination method], a portion of the combined taxable income of those corporations which are incorporated in the U.S. and which are part of a unitary business enterprise doing business in Kansas is included even though in some instances they actually operate in foreign countries. Dividends expatriated to domestic corporations from their unitary foreign organized subsidiaries are also required to be included in the Kansas tax base.

'Once the tax base has been determined, a three-factor formula based on property, sales, and payroll is utilized to apportion to the state that business income which is attributable to the business activity of the business enterprise within the state. However, before the income generated by a multijurisdictional business enterprise may be taxed under the apportionment provisions, the business is required to be unitary.

'A unitary business principle operating through a worldwide combination policy differs from the Kansas domestic combination policy. Under the worldwide combination policy, the total income of both the domestic companies and foreign unitary subsidiaries is apportioned using worldwide payroll, sales, and property factors in the denominator of the apportionment ratio. Under the domestic combination policy, only the federal taxable income of the domestic companies which includes only the dividend income from the unitary foreign subsidiaries is apportioned using the factors of the domestic companies within the apportionment formula.' (St. Ex. I, p. Inc-9 to Inc-11, Final Report and Recommendations, Kansas Tax Review Commission, June 1985)."

Kansas taxable income (Kansas tax base) is determined by reference to federal taxable income. K.S.A. 79-32,138(a).

In the case of Morton Thiokol, it appears that the income figure remains the same regardless of method, but the figure which is divided into it is greater with the worldwide combination method than with the domestic combination method; *i.e.*, the numerator of the ratio remains the same but the denominator increases with the worldwide combination method. Thus, the resulting apportionment is less when the worldwide combination method is used than when the domestic combination method is used. The bottom line is that the taxes assessed are greater when the latter method is used.

The issues raised by Morton Thiokol on appeal are presented in the following way: Morton Thiokol argues that it has been denied due process by Revenue's changing tax rules and policies without issuing regulations. It argues that Revenue's treatment of foreign dividends is improper under *Kraft Foods v. Iowa Dept.* *of Rev.*, 505 U.S. 71, 120 L. Ed. 2d 59, 112 S. Ct. 2365 (1992). It argues that the domestic combination method is contrary to K.S.A. 79-32,141 and K.A.R. 92-12-77. And it argues that it has been denied equal protection by Revenue's differential treatment of similarly situated taxpayers.

Revenue responds as follows: Morton Thiokol must use the domestic combination method. Morton Thiokol must apportion its foreign dividend income; *i.e.*, the foreign dividend income must be included in Morton Thiokol's taxable income. Morton Thiokol's due process, fundamental fairness, or estoppel claim does not preclude the use of the domestic combination method or apportionment of foreign dividends.

Before we consider the merits of Morton Thiokol's argument, we need to state our scope of review. K.S.A. 74-2426(c) provides that BOTA's order is subject to review in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* K.S.A. 77-621(a)(1) provides that Morton Thiokol bears the burden of proving the invalidity of the agency action. K.S.A. 77-621(c) provides that the court may grant relief only when it has made certain determinations, including that the agency erroneously interpreted or applied the law, that the agency made determinations of fact not supported by substantial evidence, that the agency engaged in an unlawful procedure or failed to follow prescribed procedure, or that the agency acted unreasonably, arbitrarily, or capriciously.

We first consider if Morton Thiokol was denied due process by Revenue's changing tax rules and policies without issuing regulations. Morton Thiokol complains that Revenue has failed to issue regulations relating to the Uniform Division of Income for Tax Purposes Act, K.S.A. 79-3271 *et seq.* (UDITPA). According to Revenue,

"U.D.I.T.P.A. apportions and allocates income. U.D.I.T.P.A. does not define the income base that is to be apportioned and allocated. '[T]he uniform act assumes that the existing state legislation *has defined the base*

*of the tax* and that the only remaining problem is the amount of the base that should be assigned to the particular taxing jurisdiction.' " (Emphasis added.)

Morton Thiokol argues that the absence of regulations permits Revenue to change its requirements capriciously, fail to notify taxpayers of changes, and administer tax laws on a case-by-case basis. The effect Morton Thiokol complains of is being audited three times, for tax years 1973-76, 1977-80, and 1981-83, with Revenue requiring it to compute its tax in three different ways.

In this regard, the pertinent portions of BOTA's order state:

"The Appellant argued that the inclusion of Eaton's [Eaton Laboratories, Inc., a subsidiary corporation of Morton Thiokol] income and the foreign dividend gross-up was a change in policy, and that fundamental fairness dictates that this Board should order the Department to issue regulations before using this method. The [A]ppellant's argument that this is a change of policy stems from a settlement agreement reached between the Department and the Appellant for the years 1977 through 1980. As part of the agreement, the Department considered the foreign dividend gross-up issue a litigation risk and settled the issue without assessing the foreign dividend gross-up. However, the Board finds that this settlement agreement did not necessarily constitute a policy of the Department, therefore the assessment of the foreign dividend gross-up for the years 1981 through 1983 did not reflect a change of policy. The [A]ppellant should have known that this issue could raise its head again if the [A]ppellant did not later include the foreign dividend gross-up in its income apportioned to Kansas.

"In addition, with regard to the fact that the income from Eaton was apparently not required by the Department to be included in the Appellant's income during the previous audit years of 1977 through 1980, the Department hints that this was a mistake on their part. Consequently, the Board is left to assume that if the Department had caught it, they would have also required the inclusion of Eaton's apportioned income for those years. However, the Board finds that the question of whether or not this was a mistake by the Department is irrelevant."

BOTA's order is silent on the subject of changes between requirements for the tax years 1973-76 and 1977-80, nor does Morton Thiokol mention this silence in its brief. In its petition for reconsideration of BOTA's order, Morton Thiokol made the same assertions with regard to the tax years 1973-76 as it makes in its brief, but did not mention that the order is silent on the subject or request that BOTA make findings and draw conclusions. We can only assume that Morton Thiokol does not have a complaint about the *substance* of the change between 1973-76 and 1977-

80, *i.e.*, the change from separate return filing to combined filing, but it complains merely of the fact of change. Complaining that there was change merely serves to lengthen Morton Thiokol's list of due process transgressions, even though Morton Thiokol does not object to the result of the change. We, therefore, discount the change between tax years 1973-76 and 1977-80. Moreover, the record before us is quite sketchy on this change.

Morton Thiokol asserts that for tax years 1977-80, Revenue required it to use a domestic combination method but did not include in the tax base income from its Section 936 Puerto Rican subsidiary, Eaton, and did not include dividends from foreign subsidiaries. It asserts that for tax years 1981-83, Revenue required it to include its Section 936 subsidiary income and dividends from foreign subsidiaries.

Revenue's generalized response seems to be that properly prepared returns for Morton Thiokol for tax years 1977-80 should have included the Eaton income and foreign dividends. With regard to the Eaton income, Revenue seems to be saying that it did not propose adjustments because it was unaware of Eaton's existence and is still unsure whether Eaton existed for the entire period. If it had known of Eaton, the adjustment would have been proposed for all years of Eaton's existence. With regard to foreign dividends, Revenue takes the position that it advised Morton Thiokol of the adjustment needed for proper accounting for foreign dividends and then negotiated a cash settlement of the taxpayer's tax liability for years 1977-80. Revenue states: "Nothing in the negotiated settlement of the 1977-1980 audit was agreed to prospectively apply to the 1981-1983 tax years." Revenue relies on the testimony of Robert J. Muszanski, the manager of domestic tax compliance with a former affiliate of Morton Thiokol:

"Q. . . . I simply asked was the agreement for the prior audit period by its terms agreed to apply to future periods? Was there any agreement discussing future periods?
"A. No."

To keep this issue in perspective, it is important to bear in mind that Morton Thiokol is complaining about change without regulations being issued. The changes it complains of between tax years 1977-80 and 1981-83 are treatment of Eaton's income

and foreign dividends. The change from separate return filing to combined filing was made from tax years 1973-76 and 1977-80.

Morton Thiokol contends that its witness did not agree with Revenue's position that audit settlements are not binding on future years. Of course, Revenue's "non-binding" position is that its willingness to write off the foreign dividends for tax years 1977-80 does not mean that Morton Thiokol may exclude foreign dividends for subsequent tax years. What Muszanski said was that he doubted that Revenue would have approved separate return filing rather than combined filing by Morton Thiokol in 1981 because Revenue had "established [its] position on previous audits."

Revenue asserts that "Eaton did not exist as an active corporation until 1977 or 1978." Muszanski testified that he did not know what year Eaton was created but that he believed that 1977 or 1978 was its first year. He also testified that the legislation authorizing creation of a Section 936 corporation, such as Eaton, was the Tax Reform Act of 1976. Revenue asserts that the 1976 calendar year was the first year that Eaton, if it existed, could have computed its income under the revenue code as a Section 936 corporation. Morton Thiokol's 1976 tax year was its fiscal year, which ended on June 30, 1976.

Revenue raises the possibility that it was not aware of Eaton's existence at the time of the 1977-80 audit. Revenue implies that it was up to Morton Thiokol to alert Revenue to the existence of Eaton and to request a ruling on tax treatment for it. Morton Thiokol states that the dividend gross-up was at issue when it settled its liability for the 1977-80 tax years, but that Eaton income was not mentioned.

BOTA stated in its order that with regard to Eaton income, Revenue "hints that this was a mistake" on its part. Morton Thiokol takes issue with BOTA's statement on the ground that it is not supported by testimony. There is no rule that factual findings need to be supported by testimony or even by direct evidence, and reasonable inferences are permissible. In this instance, BOTA's statement does not rise even to the level of a finding. It seems to be an observation as to Revenue's theory, and BOTA says that it is immaterial because Morton Thiokol cited

no controlling legal authority for the proposition that changes in the circumstances were improper. We agree.

Morton Thiokol relies principally on *CBS v. Comptroller*, 319 Md. 687, 575 A.2d 324 (1990). The television network challenged the state comptroller's apportionment of advertising income to the State of Maryland for tax purposes. CBS contended that the comptroller's use of an audience-share factor constituted a substantial deviation from the income source rule specified in an administrative regulation. CBS contended that in that circumstance and on the record before the court, the agency was required to promulgate a new rule in order to adopt the policy change. The Court of Appeals of Maryland agreed.

The court took pains to establish that its decision in *CBS* was not in conflict with *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 501 A.2d 48 (1985). In *Consumer Protection*, faced with the issue whether an agency is required to proceed by rulemaking as opposed to adjudication, the Maryland court decided that *on the record before the court*, it was appropriate for the agency to proceed by adjudication. 304 Md. at 755-56. In *Consumer Protection*, the agency had not changed existing law or materially modified standards, 304 Md. at 756; in *CBS* the agency had changed a policy which was represented in a rule, 319 Md. at 697-98.

Morton Thiokol contends that *CBS* is "virtually on all fours with the present case." Morton Thiokol quotes the court's conclusion that "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." 319 Md. at 696.

Morton Thiokol, however, is unable to show that any one of the changes it complains of constitutes change of "policy of general application, embodied in or represented by a rule." Its argument in this regard is that such a showing is impossible because Revenue has never promulgated pertinent rules and Revenue should not be rewarded for its failure. Morton Thiokol cites *Polaroid Corp. v. Commissioner of Revenue*, 393 Mass. 490, 472 N.E.2d 259 (1984), in which the Supreme Judicial Court of Massachusetts decided that the Commissioner of Revenue could not implement the worldwide combination method of determining a corporation's

taxable income allocated to Massachusetts without first adopting appropriate regulations. The court also concluded that the commissioner lacked statutory authority to "use the 'unitary business' approach in the circumstances of this case." 393 Mass. at 492.

Revenue argues that *Polaroid* is like *CBS* in that regulations were required because the commissioner's use of the worldwide combination method substantially deviated from an existing rule. Revenue argues that the written rule in the Massachusetts case was embodied in the Massachusetts tax statutes and that the worldwide combination method would have been inconsistent with the statutory definition of income. Revenue quotes the following:

"A more fundamental attack on the unitary system is that the commissioner's calculations require the inclusion of income of non-United States subsidiaries which is not includible in Federal gross income, the statutory starting point in calculating a corporation's taxable net income. See G.L. c. 63, § 30(5)(*a*). Although it is not necessarily inappropriate to determine an excise by considering items that are not income in a tax sense (*Commissioner of Revenue v. Massachusetts Mut. Life Ins. Co.*, 384 Mass. 607, 613 [1981]), a statutory pattern that determines taxable income by starting with Federal gross income casts doubt on the propriety of the adoption of a worldwide unitary approach in determining taxable net income." 393 Mass. at 498 n.10.

Morton Thiokol cites *Commissioner of Revenue v. New England Power Co.*, 411 Mass. 418, 582 N.E.2d 543 (1991), for the proposition that unpublished audit guidelines could not be applied to the taxpayer. The Supreme Judicial Court stated in a footnote that "the unpublished audit guidelines had not been properly adopted as policy by the department and therefore could not fairly be applied to NEP in this case." 411 Mass. at 424 n.4. This declaration, however, appears to be unnecessary to the outcome of the case, and it does not appear that "adopted as policy" necessarily involves promulgation of a regulation. The final sentence of the footnote states: "We express no opinion, however, as to whether the commissioner possesses the statutory authority to adopt such a regulation." 411 Mass. at 424 n.4.

Morton Thiokol also cites *J.R. Simplot Co. v. Tax Com'n*, 120 Idaho 849, 820 P.2d 1206 (1991), for the proposition that change may not be effected without promulgation of regulations. Morton Thiokol states that the major import of this case is that the ground for reversing an assessment was that the commission "had issued

no rules or regulations interpreting the statutes prior to issuing the assessment." Morton Thiokol overstates the significance of the absence of regulations. The Idaho court stated that one of the four traditional rationales for *judicial deference* to agency expertise is missing where the agency has failed to use its expertise to formulate regulations or, in this case, instructions on the corporate tax returns. 120 Idaho at 865. The holding of the case is that "foreign source income may not be included in the preapportionment tax base of a corporation unless that income is also federal taxable income under the provisions of I.C. § 63-3022." 120 Idaho at 866. The holding was influenced, perhaps heavily, by the absence of regulations, but the basis for the holding was interpretation of the statute, Idaho Code § 63-3022 (1989).

Revenue takes the position that none of the four cases cited by Morton Thiokol involved circumstances similar to those in the present case. We agree that the four cases are distinguishable from the present case. Revenue relies on *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, 684 P.2d 396 (1984), in distinguishing *CBS, Polaroid, New England Power*, and *Simplot* from the present case. It states that they are "off point because the domestic combination method in Kansas is a 'natural interpretation' of the statutes and is 'wholly consistent' with them. *Pioneer*, 235 Kan. at 756." Thus, according to Revenue, a formally adopted regulation is not required in Kansas for use of the domestic combination method.

In *CBS*, the Maryland court referred to *Securities Comm'n v. Chenery Corp.*, 332 U.S. 194, 91 L. Ed. 1995, 67 S. Ct. 1575 (1947), as the seminal decision in the area of rulemaking. Here is what the Maryland court said about *Chenery*:

> "[T]he Supreme Court observed that '[t]he function of filling in the interstices of the [Holding Company] Act should be performed, as much as possible, through [the] quasi-legislative promulgation of rules to be applied in the future.' [*Securities Comm'n v. Chenery Corp.*, 332 U.S.] at 202, 67 S. Ct. at 1580, 91 L. Ed. at 2002. But the Court declined to adopt 'any rigid requirement to that effect' because to do so 'would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.' *Id.* at 202, 67 S. Ct. at 1580, 91 L. Ed. at 2002. It made plain that in certain situations 'the agency must retain power to deal with the problems on a case-to-case

basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency . . . .'
*Id.* at 203, 67 S. Ct. at 1580, 91 L. Ed. at 2002 [. . . citations omitted.] *See also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S. Ct. 1757, 1771, 40 L. Ed. 2d 134, 154 (1974)." 319 Md. at 692-93.

In the present case, BOTA found that there was no change in Revenue's treatment of foreign dividends between tax years 1977-80 and 1981-83. As a matter of fact, there was a change in that Revenue negotiated a settlement which did not include foreign dividends for years 1977-80 and then required Morton Thiokol to include foreign dividends in years 1981-83. BOTA reasoned, though, that Revenue's relinquishing the point for purposes of settling Morton Thiokol's tax liability for 1977-80 did not mean that Revenue's *policy* for those years allowed foreign dividends to be excluded. Nor, according to BOTA, has Morton Thiokol established, as a matter of law, that Revenue is required to issue a regulation in order to change a policy—a true statement, but rather broad. We concur in the conclusion reached by BOTA that neither the use of the domestic combination method nor the treatment of the dividends from the foreign subsidiary constituted a change of policy. We find no merit in appellant's assertion that it was denied due process in the assessment of additional corporate income tax by Revenue.

Next, Morton Thiokol challenges Revenue's treatment of foreign dividends. In *Kraft Foods v. Iowa Dept. of Rev.*, 505 U.S. 71, 120 L. Ed. 2d 59, 112 S. Ct. 2365 (1992), the United States Supreme Court held that Iowa's treatment of the corporation's dividends received from foreign subsidiaries violated the foreign commerce clause of the federal Constitution. The Iowa statute, like the federal business income tax scheme, allowed a deduction for dividends received from domestic subsidiaries but not for dividends received from foreign subsidiaries. The Iowa statute, unlike the federal scheme, did not allow a credit for taxes paid to a foreign country.

In *Kraft*, the Iowa Supreme Court rejected Kraft's claim that the disparate treatment of domestic and foreign subsidiary dividends was unconstitutional, at least in part, because Kraft had

not demonstrated that Iowa businesses enjoyed an advantage over foreign commerce due to the statute. The United States Supreme Court, however, decided that the Iowa statute facially discriminated against foreign commerce. Justices Blackmun and Rehnquist dissented on the grounds that the statute did not facially discriminate and the record contained insufficient evidence of discrimination.

Morton Thiokol's claim is that Kansas' treatment of foreign dividends, including Section 78 "gross-up," is improper under the reason and rule of *Kraft*. The Iowa and Kansas tax schemes differ, and there is no mention of Section 78 "gross-up" in *Kraft*. Morton Thiokol's argument, therefore, relies heavily on analogy and extrapolation.

The foreign tax credit which made the difference between the federal and Iowa business tax schemes is available to domestic corporations under 26 U.S.C. § 901 (1988). Domestic corporations may elect either a deduction for taxes paid to foreign jurisdictions or the foreign tax credit. 12 Mertens, Law of Federal Income Taxation § 45D.03, p. 37 (1993). "[T]he credit is likely to be beneficial as it provides a dollar for dollar reduction in tax." 12 Mertens, § 45D.03, p. 37.

Domestic corporations which elect to take the credit for taxes deemed paid include taxes deemed paid in their gross income. Domestic corporations are deemed to have paid the taxes related to the income they receive from foreign subsidiaries which are paid by the foreign subsidiaries to foreign jurisdictions. 12 Mertens, § 45D.01, p. 2. "When taxes are deemed paid by a domestic corporation, . . . the corporation electing the foreign tax credit is required to include in its gross income the amount of its deemed paid taxes *as a dividend under Section 78*." (Emphasis added.) 12 Mertens, § 45D.14, p. 132. 26 U.S.C. § 78 (1988) states in pertinent part:

"If a domestic corporation chooses to have the benefits of [the foreign tax credit] for any taxable year, an amount equal to the taxes deemed to be paid by such corporation . . . for such taxable year shall be treated . . . as a dividend received by such domestic corporation from the foreign corporation."

A foreign corporation, even if wholly owned by a domestic corporation, is a separate entity and not directly subject to the

taxing power of the United States. 12 Mertens, § 45E.05, p. 21. Domestic corporations, however, are taxed on their worldwide income. 12 Mertens, § 45E.01, p. 1. The "normal tax rules regarding stock ownership" are applied so that the domestic corporation which owns stock in a foreign subsidiary is not taxed on "the results of the foreign corporation's operations," but when the domestic corporation receives a dividend from a foreign subsidiary, "United States tax arises." 12 Mertens, § 45E.01, pp. 1-2. The theory of the tax credit is that it affords some protection from the double taxation to which dividends, in theory at least, otherwise would be subject. 12 Mertens, § 45E.01, p. 2.

According to the parties, Iowa does not permit combined filing for unitary business enterprises. The parties cite *Kraft*, 120 L. Ed. 2d at 64 n.9, which states: "Iowa is not a State that taxes an apportioned share of the entire income of a unitary business, without regard for formal corporate lines." Thus, according to Morton Thiokol, the application of the reason and rule of *Kraft* to Kansas' combined filing requires a close reading of footnote 23. It states:

"If one were to compare the aggregate tax imposed by Iowa on a unitary business which included a subsidiary doing business throughout the United States (including Iowa) with the aggregate tax imposed by Iowa on a unitary business which included a foreign subsidiary doing business abroad, it would be difficult to say that Iowa discriminates against the business with the foreign subsidiary. Iowa would tax an apportioned share of the domestic subsidiary's entire earnings, but would tax only the amount of the foreign subsidiary's earnings paid as a dividend to the parent.

"In considering claims of discriminatory taxation under the Commerce Clause, however, it is necessary to compare the taxpayers who are 'most similarly situated.' *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 71, 10 L. Ed. 2d 202, 83 S. Ct. 1201 (1963). A corporation with a subsidiary doing business in Iowa is not situated similarly to a corporation with a subsidiary doing business abroad. In the former case, the Iowa operations of the subsidiary provide an independent basis for taxation not present in the case of the foreign subsidiary. A more appropriate comparison is between corporations whose subsidiaries do not do business in Iowa." 505 U.S. at 80 n.23.

The conclusion drawn by Morton Thiokol from footnote 23 is that under Kansas' taxing scheme, there would be violative discrimination between the treatment of a domestic subsidiary which is less than 50% owned by the parent (Y) and a foreign subsidiary

(Z). It appears that the hypothetical comparison also requires that neither Y nor Z did business in Kansas so that neither would be required to file a separate return in Kansas. Neither would be included in the domestic combination method. Y would not be included, according to Morton Thiokol, because the parent's ownership percentage is too small; Z would not be included because it is foreign. According to Morton Thiokol, "little or no tax" would be paid by the parent on dividends from Y, but dividends from Z would be taxed in full. This conclusion seems to be derived from that part of the Kansas taxing scheme which, like the federal scheme, allows a deduction for dividends from domestic subsidiaries but not for dividends from foreign subsidiaries. Thus, the argument continues, discrimination against foreign commerce would result.

Morton Thiokol does not claim to have any domestic subsidiaries which, like the hypothetical Y, do not do business in Kansas and are less than 50% owned by Morton Thiokol. Revenue points out that Morton Thiokol relies on hypothetical examples rather than building its case on its own factual circumstances. Morton Thiokol also postulates several other instances in which a domestic subsidiary would not be included in a combined filing. None, however, is applicable to Morton Thiokol in the present case.

The holding of *Kraft* is that the Iowa statute's treating dividends received from foreign subsidiaries less favorably than dividends received from domestic subsidiaries is unconstitutional discrimination against foreign commerce. One of the arguments considered and rejected by the Court was that any discrimination against foreign commerce by Iowa can be justified because in the grand scheme, "the benefit to domestic subsidiaries might happen to be offset by other taxes imposed not by Iowa, but by other States and by the Federal Government." 505 U.S. at 81. It was in the context of this argument that the Court inserted footnote 23. The footnote follows this sentence in the text of the opinion: "But whatever the tax burdens imposed by the Federal Government or by other States, the fact remains that Iowa imposes a burden on foreign subsidiaries that it does not impose on domestic subsidiaries." 505 U.S. at 80.

The text contains the strong, unqualified statement that Iowa burdens foreign subsidiaries more than domestic ones. The footnote contains a qualification which would have diluted the strength and clouded the clarity of the text without materially altering the reasoning. Without it, however, the statement would not have been unequivocally accurate. The footnote states that the burden will not always be unequal. The first paragraph sketches circumstances in which there would be no inequality; the second paragraph explains why the discriminatory circumstances are the ones on which the Court based its ruling.

Morton Thiokol interprets footnote 23 to mean that if any hypothetical circumstances can be devised which will result in differential treatment, the taxing scheme is unconstitutional. We find that interpretation is too broad. If that is what the Supreme Court meant, it easily could have said so. It did not say so. What we understand the Supreme Court to say was that the appropriate measure of discrimination is comparison of similar circumstances, and the circumstances chosen to illustrate the Supreme Court's point seem ordinary rather than extraordinary and likely rather than unlikely. The comparison it suggested as appropriate in *Kraft* is "between corporations whose subsidiaries do not do business in Iowa." 505 U.S. at 80 n.23. That measure reveals discrimination, while an inappropriate or less appropriate comparison does not.

We interpret the significance of footnote 23 for the present case to be in identifying the appropriate comparison. Morton Thiokol, of course, advocates that a domestic subsidiary which does not do business in Kansas and is not included in combined filing should be compared with a foreign subsidiary which does not do business in Kansas and is not included in combined filing. The Supreme Court compared a parent corporation with a domestic subsidiary which does not do business in Iowa to a parent corporation with a foreign subsidiary which does not do business in Iowa. In this comparison, Iowa discriminated against the parent corporation with the foreign subsidiary because Iowa allowed a deduction for the dividends received by the parent with the domestic subsidiary, but not for the dividends received by the parent with the foreign subsidiary. Because the domestic subsidiary did no business in Iowa, there was no independent basis for

taxing it and thereby balancing the burdens. In Morton Thiokol's comparison, where neither of the non-combined subsidiaries did business in Kansas and therefore would not file returns in Kansas, there would be no independent basis for taxing either of the subsidiaries.

Revenue correctly points out that *Kraft* "does not address the taxation of foreign dividends by domestic combination states." Clearly, *Kraft* does not hold that the taxation of foreign dividends by a combination method is facially unconstitutional. Revenue contends that the aggregate tax imposed by Kansas on a unitary business with a domestic subsidiary would not be less burdensome than that imposed by Kansas on a unitary business with a foreign subsidiary because the income of the domestic subsidiary would be combined, apportioned, and taxed while only the dividend of the foreign subsidiary would be taxed. Allowing a deduction for the domestic dividend avoids double taxation. It is the use of the domestic combination method which distinguishes the Kansas and Iowa tax schemes.

Morton Thiokol also argues that Kansas' treatment of Section 78 "gross-up" is improper under *Kraft*. Morton Thiokol explains that the term "Section 78 'gross-up' " results from the foreign dividend's being increased ("grossed up") by the amount of the deemed paid taxes. Its argument with regard to the "gross-up" is identical to its argument on foreign dividends in general.

The hypothesized examples bear little, if any, resemblance to the actual circumstances of the taxpayer in the present case. In a combined filing state, such as Kansas, the hypothetical parent's tax base includes the combined federal taxable income of its combined domestic subsidiaries as well as dividends from foreign subsidiaries. We conclude there is no showing that this method is discriminatory under the holding in *Kraft*; therefore, it is not violative of the federal Constitution's Commerce Clause (Art. I, § 8, cl. 3).

It should be noted that *Kraft* was not considered by BOTA in reaching its decision in the present case. BOTA's order was issued on February 17, 1992, and Morton Thiokol's petition for reconsideration was denied on March 16, 1992. *Kraft* was decided June 18, 1992.

We next consider if the domestic combination method is contrary to K.S.A. 79-32,141 and K.A.R. 92-12-77. K.S.A. 79-32,141 provides:

"The director may allocate gross income, deductions, credits, or allowances between two or more organizations, trades or businesses (whether or not incorporated, or organized in the United States of affiliated) owned or controlled directly or indirectly by the same interests, if the director determines such allocation is necessary to prevent evasion of taxes or to clearly reflect income of the organizations, trades or businesses."

In its order, BOTA stated:

"The Board also agrees with the Director of Taxation, that K.S.A. 79,32,141 authorizes the Department to utilize the combined report method when two or more corporations are conducting a unitary business. The appellant argues that the Director also must make some type of showing that the combined report method is necessary to clearly reflect income of the business, and that in this case no showing was made. However, the Board finds that this is an erroneous interpretation of the statute, and that pursuant to the statute this method can be required by the Director if the Director determines that it is necessary."

With regard to the middle sentence of the quoted portion of the BOTA order, Morton Thiokol denies arguing that the Director was required to make a determination that the combined reporting method was necessary to clearly reflect the income of the business. Morton Thiokol asserts that it argued, instead, that the Director was required to make a determination that it was necessary to include Eaton's Section 936 subsidiary income and the foreign dividend Section 78 gross-up in its taxable income. Morton Thiokol, of course, contends that the requisite determination was not made.

Morton Thiokol contends that the worldwide combination method rather than the domestic combination method should be used to compute its Kansas tax liability for tax years 1981-83. It argues that the worldwide combination is the only "fair method of apportionment" "because otherwise Kansas will be taxing more than 100% of the income arising from the operations of the Taxpayer from its domestic U.S. corporations." We find no support in the record for this statement.

Morton Thiokol also takes the position that K.A.R. 92-12-77 authorizes the use of the worldwide combination method. The regulation states:

"If a particular trade or business is carried on by a taxpayer and one (1) or more affiliated corporations, nothing in K.S.A. 79-3271 *et seq.*, and 79-4301, article IV or in these regulations shall preclude the use of a combined income method of reporting whereby the entire business income of such trade or business is apportioned in accordance with K.S.A. 79-3279 to 79-3287 and 79-4301, article IV.9 to IV.17."

In order to explain the difference between the domestic combination method and the worldwide combination method, BOTA quoted from the June 1985 Final Report and Recommendations of the Kansas Tax Review Commission. The quoted paragraphs are set out in our initial discussion of BOTA's order.

Based on the following excerpt from the Report, BOTA concluded that the legislature intended that the domestic combination method be used:

" 'The Kansas domestic combination policy has been sanctioned by the Kansas Legislative committees on numerous occasions. The 1983 Special Committee on Assessment and Taxation examined the Department of Revenue's utilization of domestic combination. This Committee also considered the possible implementation of a worldwide combination policy, but declined to make recommendations for statutory change. It also noted that Governor John Carlin has taken a position against a worldwide combination policy.' "

BOTA also relied on the Report to supply its rationale:

" 'The Commission is mindful that the problems attendant in any method devised to tax the income of multijurisdictional corporations are some of the most complex of any faced by the state in the administration of the various tax laws. The unitary system of taxation whereby combined reporting of income is required of a unitary business enterprise appears to be a necessary policy for the state to ensure full accountability for 100 percent of the income of the enterprise. Absent such a policy it would be possible for a multiple-entity business enterprise to shift income from state to state by means of manipulative accounting. On the other side, the Commission recognizes that the Kansas domestic combination policy is perceived by many to contain inherent inequities. Although transition to a worldwide combination policy may eliminate some of these perceived inequities, the Commission is unable to make such a recommendation in light of the competition among states to foster economic development and the perception of such a form of taxation in the business community. The current system of taxing multijurisdictional corporations, while not perfect, is appropriate for the time being. Therefore, the Commission makes the following recommendation.

'Recommendation

'The state should continue a unitary system of taxing income of multijurisdictional corporations through its present domestic combination policy.

The Commission does not believe it is desirable to adopt a worldwide combination method of taxation.' "

Revenue contends that the various states use a variety of apportionment methods and that the domestic combination method is nothing more or less than one of many acceptable methods for apportioning income. Revenue asserts that Oklahoma prohibits combined filing; Missouri limits combined filing to corporations which do at least half of their business in the state (*Williams Companies v. Director of Revenue*, 799 S.W.2d 602 [Mo. 1990], *cert. denied* 501 U.S. 1260 [1991]); Colorado has approved use of the worldwide combination method only in certain circumstances (*Hewlett-Packard Co. v. Dept. of Revenue*, 749 P.2d 400 [Colo. 1988]); and the California Supreme Court, reviewing a series of United States Supreme Court decisions involving state taxation of multinational corporations, noted that assessments will be disturbed only when the corporate taxpayer has shown by clear and cogent evidence that the income attributed to the state is out of all proportion to the business transacted in the state (*Barclays Bank Internat., Ltd. v. Franchise Tax Bd.*, 2 Cal. 4th 708, 720, 8 Cal. Rptr. 2d 31, 829 P.2d 279 [1992]). In *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, 756, 684 P.2d 396 (1984), this court quoted *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983), for the same proposition which was set out in the California opinion. This court stated that in *Container Corp.* the high court had "approved, in general, the three-factor income allocation formula set forth in UDITPA." 235 Kan. at 756.

K.A.R. 92-12-77 provides that nothing in UDITPA or the multistate tax compact article on division of income or Kansas regulations "shall preclude the use of a combined income method of reporting." As Revenue points out, UDITPA "apportions and allocates income," but it "does not define the income base that is to be apportioned and allocated." The preapportionment tax base is defined by K.S.A. 79-32,138(a) using federal taxable income, and K.S.A. 79-32,138(d) provides that the preapportionment tax base is apportioned and allocated using UDITPA. We concur in the conclusion reached by BOTA. We find no merit in appellant's argument and conclude that the use of the domestic

combination method is not contrary to K.S.A. 79-32,141 and K.A.R. 92-12-77.

Finally, Morton Thiokol argues that it was denied equal protection by Revenue's differential treatment of similarly situated taxpayers. The hearing in this action was held on November 20, 1991, and BOTA's order was issued on February 17, 1992. Eleven days later the director for corporate tax for Caterpillar Inc. wrote to Muszanski "a follow-up to recent discussions you have had with members of our tax department." When Morton Thiokol petitioned BOTA for reconsideration of its order, it attached a copy of the letter from Caterpillar, asserted that Caterpillar and Morton Thiokol are similarly situated corporations, and posed some rhetorical questions about equal protection.

In its brief, Morton Thiokol asserts that its petition for reconsideration "requested that the Board have an evidentiary hearing and that the Taxpayer was attaching this letter in the nature of newly discovered evidence and requesting the Board for oral argument on reconsideration of its Order, and having an evidentiary hearing to clarify the record." K.S.A. 1992 Supp. 77-529 is the statutory authority for filing a petition for reconsideration with BOTA. It indicates that "the specific grounds upon which relief is requested" should be stated by the aggrieved party. K.A.R. 94-2-11(c) provides, in pertinent part:

"If the motion for rehearing is for the purpose of submitting new or additional evidence that was not available at the time of the hearing or at the time all evidence was submitted for the board's review, the nature and import of such evidence shall be briefly stated. Evidence that was available or that could have reasonably been made available at the time of the hearing or at the time all evidence was submitted for the board's review that was not submitted at that time will not be allowed except for good cause shown and at the discretion of the board."

On March 16, 1992, BOTA denied the petition for reconsideration. In pertinent part, the order states:

"The Board finds, upon review of the Appellant's Motion for Rehearing, that no new or additional evidence is offered that would persuade the Board that the original order should be modified or that a rehearing should be granted. The Board, therefore, concludes that the Order as originally issued should be, and is hereby, sustained."

After Morton Thiokol had taken an appeal from the order of BOTA and the record was being or had been certified for the

appeal, Revenue filed a motion requesting that the Caterpillar letter be removed from the record on appeal on the ground that it was unoffered and unadmitted. The motion was granted by BOTA on September 28, 1992. The issue has been preserved for determination in this appeal.

Morton Thiokol did not, in its petition for reconsideration, present the letter as newly discovered evidence or offer reasons why the letter was not obtained earlier. Morton Thiokol did not request that the proceeding be reopened or that there be an evidentiary hearing specifically with regard to Caterpillar. Morton Thiokol, however, did state that there are other similarly situated corporations and that it "believes some of these other taxpayers will come forward, if the Board reopens the evidentiary hearing." We conclude that BOTA did not commit error in granting Revenue's motion to remove the letter from the record on appeal. Our conclusion is based upon the fact that the letter was not admitted into evidence and, in addition, appellant failed to comply with the provisions of K.A.R. 94-2-11(c). Absent the letter, there is no evidentiary basis for Morton Thiokol's equal protection argument.

The order of BOTA affirming the Kansas Department of Revenue's assessment of additional corporate income tax against the taxpayer, Morton Thiokol, Inc., is affirmed.